651 A.2d 149

**Leonard BARRACK and Lynne Barrack, Appellees,**

v.

**James J. KOLEA, Beverly Kolea, John J. Kolea and Patricia Kolea, Appellants.**

Superior Court of Pennsylvania.

Argued Oct. 20, 1994.

Filed Dec. 5, 1994.

12

14

David A. Koss, Wynnewood, for appellants.

Sheldon L. Albert, Philadelphia, for appellees.

Before OLSZEWSKI, HOFFMAN and HESTER, JJ.

OLSZEWSKI, Judge:

James, Beverly, John, and Patricia Kolea (appellants) appeal a judgment awarding Leonard and Lynne Barrack (appellees) $109,597 in damages for appellants' breach of contract. Following a six-day bench trial, appellants moved for a judgment n.o.v., remittitur, or a new trial. Their motion was denied. This appeal followed.

Appellants are builders of fine homes in the Philadelphia area. On January 31, 1990, they entered into a contract with appellees to complete construction of a home in consideration for $1,900,000. Settlement was executed on June 28, 1990. On that date a punch list of items to be completed was furnished to appellees, with the proviso that items within the control of seller would be completed within two weeks of that date. R.R. at 1775a. (This list merged punch lists of incomplete items created prior to settlement.) The home still was not finished when appellees moved into it in late August. Appellants and their subcontractors nonetheless continued to work on appellees' home. On October 12, 1990, appellees complained to appellants in writing that significant problems with the house remained unresolved. R.R. at 1778a. On

October 25, 1990, the parties agreed to a newly revised punch list. R.R. at 1783a–1784a.[1]

The work on the home continued until January of 1991, when the relationship between the two parties became irrevocably severed. Appellees were becoming more and more frustrated and dissatisfied with appellants' inability to promptly and effectively make all necessary repairs and finish all of the required work. Earlier in December, 1990 appellants wrote appellees a letter claiming that all punch list items were complete, except for work on the pool, which would be worked on the following spring. R.R. at 1566a. Appellants now admit that their December, 1990 letter was incorrect. Appellants' brief at 10. Appellees responded to this letter with a new punch list. In early January, one of appellees met with the builders' representative to further discuss the problems with the house. As a result of that meeting, appellants sent appellees a letter itemizing a new punch list of uncompleted work. Appellees believed this last list seriously under-represented the number of items to be completed, and considered the letter to be an insult. R.R. at 882a. In response, appellees sent a five-page letter listing the work still unfinished by appellants. This letter gave appellants until the 23rd of January, 1991, to make "acceptable arrangements", or else appellees would initiate legal proceedings. The parties could not resolve their differences, and no further work was completed by appellants on appellees' home. On February 1, 1991, appellees instituted this present action.

Appellees claimed that the work appellants and their subcontractors did was shoddy and unprofessional. They also claim that at some point in the fall of 1990 appellants became arrogant, uncooperative, and uninterested in hearing their complaints. R.R. at 150a–152a, 872a. Workers were improperly supervised and only gave cursory attention to the problems in the house. R.R. at 151a, 891a. Major items of

1. Apparently several different punch lists were in circulation between the time the appellees contracted to buy the house and the time this litigation was initiated. Each list would add items that were not finished, refer to items that were improperly repaired, or call the builders attention to latent defects as they appeared.

appellees' complaint included an improperly installed roof, falling roof tiles, a leaking swimming pool and spa, kitchen counter-tops installed without a bullnose sufficient in width to protect the cabinets, an incomplete bathroom vent system, outside drainage problems, exposed drywall seams, improperly functioning heating and plumbing systems, a noninsulated cupola window, condensation and/or water seepage inside the house, poorly stained wooden floors and improperly matched floor tiles, and a general unfinished quality to the house. The following colloquy between the court and one of appellee's expert witnesses distills some of the flavor of appellees' complaints:

THE COURT: I must say, it's hard for me to believe that every trade, every trade involved in this house screwed up. Not one of them did it right. We got the roofers screwing up, we got the tile setters screwing up, we got the carpenters screwing up, you got your heating and air conditioning guys screwing up. You got the—what do you call the fellows that do the wallboard?

THE WITNESS: Drywallers.

THE COURT: Drywallers. They screwed up. Nobody did anything right? There's nothing complimentary you can say about one trade, one subcontractor? Not one you—you couldn't find one nice thing to say? How about the electrician?

THE WITNESS: The electrician had problems within the house as well.

THE COURT: Even the electrician. Even the electrician.

THE WITNESS: Even the electrician.

R.R. at 415a–416a. At one point in the proceedings the court stated that "this is starting to sound like that movie, 'The Money Pit.'" R.R. at 178a. Appellees claimed damages in excess of $200,000. They were awarded $109,597.

Appellants allege the trial court erred by: (1) finding that appellees were entitled to money damages despite an express agreement between the parties that appellants' obligation if

work was incomplete or substandard was limited to the repair and replacement of any defective materials, equipment, or workmanship; (2) failing to recuse itself because it prejudged the issue of the improperly installed roof; (3) assessing damages for the defective roof in light of appellee's failure to prove specific, sustained damages; (4) allowing hearsay testimony on the matter of the cost to repair and/or replace the pool and roof; and (5) awarding excessive damages in light of the weight of the evidence. We will examine appellants' issues *seriatim.*

The scope of review in deciding whether or not a trial court erred in not granting a new trial is broader than when we pass on whether or not a denial of a judgment n.o.v. was an abuse of discretion. *Yandrich v. Radic,* 291 Pa.Super. 75, 435 A.2d 226 (1981), *appeal dismissed,* 499 Pa. 271, 453 A.2d 304 (1982). Here we must consider all of the evidence. *Handfinger v. Philadelphia Gas Works,* 439 Pa. 130, 266 A.2d 769 (1970). Only when the verdict is so contrary to the evidence so as to shock one's sense of justice should a new trial be granted, however. *Burch v. Sears, Roebuck and Co.,* 320 Pa.Super. 444, 467 A.2d 615 (1983). We will not reverse the decision of the trial court in refusing to grant a new trial unless there has been a clear abuse of discretion or an error in law determinative to the outcome of the case. *Spang & Co. v. United States Steel Corp.,* 519 Pa. 14, 545 A.2d 861 (1988).

The contract executed by the parties in which appellees agreed to buy the house in consideration for $1,900,000 stated, in part, the following:

4. *Alteration and Construction of the Property.*

(b). Said dwelling unit and appurtenances shall be constructed in a first class, workmanlike manner ...

(e). Seller warrants to Buyer that all materials and equipment incorporated into the alterations and construction of the dwelling unit and appurtenances will be new, good quality, free from liens and defects.... The foregoing warranties shall run to buyer only, shall be exclusive and in lieu of any and all other warranties.... These warranties

shall continue for a period of twelve (12) months from the date of the settlement, and any claim made by Buyer pursuant to these warranties must be in writing to Seller and received by Seller within said twelve (12) month period from the date of the settlement. Seller's obligation under these warranties is limited to the repair or replacement of any defective materials, equipment or workmanship.

R.R. at 1738a–1739a. Appellants argue that their obligation under the contract was limited by the express provision of the warranty. They further claim that the language of section 4(e) of the contract, *supra*, precluded an award of money damages by strictly limiting their duty following their breach of the contract to the repair or replacement of the defective materials and/or appurtenances by themselves or their agents. Appellees' only recourse then if appellants breached the contract by not constructing the house in a "first class, workmanlike manner" would be to allow appellees to cure the defect. We believe that this argument is without merit.

We find no precedent for appellants' proposition. Appellants cite the following to support their theory: *Elliott–Lewis Corp. v. York–Shipley, Inc.*, 372 Pa. 346, 94 A.2d 47 (1953); *New York State Electric & Gas Corp. v. Westinghouse Electric Corp.*, 387 Pa.Super. 537, 564 A.2d 919, 924 (1989); *Eimco Corp. v. Joseph Lombardi & Sons*, 193 Pa.Super. 1, 162 A.2d 263, 266 (1960); and *Magar v. Lifetime, Inc.*, 187 Pa.Super. 143, 144 A.2d 747 (1958). In these cases it was held that exclusive remedy clauses in contracts are fully enforceable. *See Jim Dan, Inc. v. O.M. Scott & Sons Co.*, 785 F.Supp. 1196 (W.D.Pa.1992); *National Cash Register Co. v. Modern Transfer Co., Inc.*, 224 Pa.Super. 138, 302 A.2d 486 (1973). These clauses are not interpreted to mean, however, that an innocent party's sole remedy would be to allow the breaching party unlimited attempts to cure the defect, to have unlimited bites at the apple, so to speak. *Cf. Elliott–Lewis, supra*, 372 Pa. at 348–50, 94 A.2d at 49 (stating that exclusive remedy clauses are to be strictly but reasonably construed). Rather, exclusive remedy clauses such as the one at issue are primarily meant to limit the damage award to actual, or substitutionary,

as opposed to consequential and incidental damages. *Cf.* White, J.J. & Summers R.S., UNIFORM COMMERCIAL CODE § 12–10 (3rd ed. 1988) (suggesting that when an exclusive remedy fails, the innocent party might be entitled to recover consequential and incidental damages as well as some form of difference of money damages).

In *Westinghouse,* plaintiff alleged defects in the design, manufacture, and supply of a generator, seeking to recover damages for lost profits as well as the cost of replacement power, in addition to the replacement of the defective parts. There we held that the recovery of consequential and incidental damages was precluded under the terms of the contract. *Westinghouse, supra,* 387 Pa.Super. at 547–50, 564 A.2d at 924–925. Defendant in *Westinghouse* did, moreover, cure the breach by replacing the defective parts within the time expressed in the purchase order. *Id.* at 558–60, 564 A.2d at 930. *Westinghouse* simply reaffirms the proposition that plaintiff's remedy may be limited to the terms of the exclusive remedy clause, and is silent on the question of whether the clause is still enforceable in the face of a repeated failure to cure. Similarly both *Elliott–Lewis* and *Eimco* simply hold that courts will enforce a remedy clause that contractually excludes an award of consequential or incidental damages. *E.g., Eimco,* 193 Pa.Super. at 6–7, 162 A.2d at 266.[2]

In *Magar* the exclusive remedy clause limiting the builder's liability stated, "The liability of the Contractor for defective material or installation under this guarantee is hereby limited to the replacement or correction of said defective material and/or installation, and no other claims or demands shall be made upon, or required to be allowed by the Contractor." *Magar, supra,* 187 Pa.Super. at 146, 144 A.2d at 748. There we stated that "[t]he limitation of liability for damages thus agreed upon in the contract was valid and enforceable." *Id.* We do not now interpret this statement to mean that

2. As in *Westinghouse,* the manufacturer in *Eimco* timely cured the breach by replacing the alleged defective parts of a rockershovel machine. *Eimco Corp. v. Joseph Lombardi & Sons,* 193 Pa.Super. 1, 162 A.2d 263 (1960).

20

money damages were precluded, or would necessarily be precluded, by similarly worded exclusive remedy clauses.[3]

■ At most we interpret the exclusive remedy clause in the contract before us as requiring appellees to give appellants a reasonable time to cure defective materials and workmanship. *Cf.* 13 Pa.C.S.A. § 2508 (giving a seller a reasonable time to cure a defect in tendered goods when either time of performance of the contract has not yet expired or seller reasonably believed buyer would accept the goods). By analogy to sale of goods contracts, the definition of a reasonable time to cure depends upon the attending circumstances. *Id.* at Comment 3. Here the parties settled in June. Appellees moved into the house at the end of August. By mid-October they were still experiencing difficulties with the house. They did not see any resolution to their problems in sight by year's end, nevertheless they gave appellees one final chance to rectify the situation. Appellants had exhausted all reasonable time to cure and still had not made good on their warranty.

■ We also reference, by analogy, to the Pennsylvania Uniform Commercial Code, to note that appellees could have reasonably believed that the January letter from appellants in which they failed to include on their punch list a number of items still uncompleted, acted as a repudiation of appellants' obligations under the warranty. *Cf.* 13 Pa.C.S.A. § 2610 (stating in its comment that "[r]epudiation can result from action which reasonably indicates a rejection of the continuing obligation"). Under such circumstances, the remedy available to appellees under the warranty failed in its essential purpose. *See Earl Brace & Sons v. Ciba–Geigy Corp.,* 708 F.Supp. 708 (W.D.Pa.1989).

■ Appellants' second argument is that the Honorable Bernard J. Avellino, presiding over the trial, prejudged the issue of the quality of the roof and should have recused

**3.** In *Magar,* plaintiff was denied recovery not only because of the exclusive remedy clause, but also because the money damages alleged were not proven. *Magar v. Lifetime, Inc.,* 187 Pa.Super. 143, 146, 144 A.2d 747, 749 (1958).

himself upon appellants' motion. This motion was denied. R.R. at 847a. To support their claim appellants assert that the court asked appellees and their witnesses leading questions, in effect supplying for appellees' case various claims that they themselves might not have introduced at trial. R.R. at 843a–847a. "It is the burden of the party asserting that a judge should be disqualified to make sufficient allegations of bias, prejudice or unfairness necessitating recusal, and a failure to do so will result in denial of the recusal motion.... If a judge rules that he or she can hear and dispose of the case fairly and without prejudice, that decision will not be disturbed on review absent an abuse of discretion." *Commonwealth v. Frank*, 395 Pa.Super. 412, 436, 577 A.2d 609, 621, *allocatur denied*, 526 Pa. 629, 584 A.2d 312 (1990) (quoting *Commonwealth v. O'Shea*, 523 Pa. 384, 408, 567 A.2d 1023, 1034 (1989) (citations omitted)). A review of the record reveals that the court was merely trying to expeditiously ascertain the allegations of appellees. It should be remembered that this was not a jury trial. The colloquies between appellees and the court were attempts to clarify the record and are not evidence of the court's pre-judging the testimony. One brief exchange between the court and appellants' attorney illustrates the difference between attempting to understand testimony and prematurely agreeing with testimony:

> THE COURT: Okay. And all of these things are based upon assumptions, on assumptions, i.e., that this needs to be done or it's causally related to a breach of contract. I understand all that.

> MR. KOSS: That's what I wanted to bring out your Honor.

> THE COURT: I understand all of that. Believe me, I understand all of that. If I don't buy this—if I don't buy one of the underlying assumptions, we never get to the price.

R.R. at 556a. Appellants have failed to meet their burden to prove that there was an abuse of discretion in the trial court's refusal to recuse itself.

22

Appellants' third claim argues that the evidence was too insubstantial to support an award for damages for the repair and/or replacement of the roof. Evidence is substantial if relevant and adequate to support a reasonable person's conclusion. *Frye v. Schweiker,* 587 F.Supp. 455 (D.C.Pa.1984). Inferences of fact which are mere guesses, conjecture, or speculation will not support a verdict, however. *Farnese v. Southeastern Pennsylvania Transp. Authority,* 338 Pa.Super. 130, 134–36, 487 A.2d 887, 890 (1985). "[T]here must be evidence upon which logically its conclusion may be based." *Id.* (citations omitted).

Here appellants admit that the roof was built contrary to the manufacturer's specifications. Appellants' brief at 38. They argue nonetheless that actual damages were not proven. Appellees introduced sufficient evidence to prove that the roof was defective. Second, the measure of damages in such an instance is not physical damage to appellees or their roof, but their loss of the benefit of the bargain. Appellants' mistake is in confusing harm with damage. Appellees may not have suffered a harm, but they have been damaged by not receiving what they had contracted to receive: a roof of superior quality.

> Courts and lawyers often use the term damages to mean either the harm or loss suffered by the plaintiff or the legal remedy for that loss. Sometimes this usage leads to confusion. The amount of the *harm* may be either more or less than the amount of the *damages.* For example, suppose D enters on P's land and spends the weekend there, but without causing *harm:* observers could neither see nor measure a loss in value to P. Although P has suffered no *harm,* she may recover *damages.*

Dobbs, D.B., LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION, § 3.1 (2nd ed. 1993) (emphasis in original) (footnotes omitted).

Appellants' argument that the roof might never fall down is beside the point. Appellees' witnesses testified that the roof was inferior because the heavier concrete tiles were used in place of cedar shake tiles. These tiles were not

fully supported because appellants failed to install battens. While appellants' expert did testify that battens were not needed nor recommended (R.R. at 920a), it is not for this Court to resolve such conflicts in evidence. *Standard Pipeline Coating Co. Inc. v. Solomon & Teslovich, Inc.*, 344 Pa.Super. 367, 496 A.2d 840 (1985) (holding that it is not the role of this Court to act as a trier of fact); *Janson v. Hughes*, 309 Pa.Super. 399, 455 A.2d 670 (1982) (resolving factual conflicts is an exclusive responsibility of the trier of fact). When the installation of the roof was not done in accordance with the manufacturer's specifications, the manufacturer's warranty became void—a legally cognizable damage. R.R. at 579a. That appellees cannot point to a definite future harm does not mean that they do not presently have a legally compensable claim for damages. Appellants fail to distinguish between a substitutionary remedy and a *specie* remedy. *See* Dobbs, *supra* at § 3.1 (stating that *specie* remedies are akin to specific performance, *e.g.*, where plaintiff recovers the price due on an account). Damages are not speculative when they are certain in fact, even if uncertain as to amount. *See Pashak v. Barash*, 303 Pa.Super. 559, 450 A.2d 67 (1982).

Appellants next argue that the damage award for the pool and the roof was based upon hearsay testimony as to the amount of the award. There is nothing in the record to indicate that any of the total damage award was based on the cost of fixing the defective pool. The court awarded a lump sum verdict. *See* opinion 4/7/94 at 3. In addition, the court indicated that appellants had prevailed on the issue of the pool. R.R. at 731a–732a.

Appellees' expert, William Tallman, testified to the cost of replacing the roof. Appellants claim that his calculations were nothing more than the re-transmission of figures arrived at by subcontractors who did not themselves testify; as such these were the statements of out-of-court declarants and they should have been excluded as hearsay. "The admission of expert testimony is a matter of discretion of the trial court and will not be remanded, overruled or disturbed unless there was a clear abuse of discretion." *Estate of Pew*, 409 Pa.Super. 417,

598 A.2d 65 (1991) (citation omitted), *allocatur denied,* 530 Pa. 645, 607 A.2d 255 (1992). Rule 703 of the Federal Rules of Evidence, adopted by the Commonwealth, states that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." 28 U.S.C.A. Rule 703; Packel, L. and Poulin, A.B., PENNSYLVANIA EVIDENCE § 703 (1987).

Appellants argue that Tallman simply repeated the data of others without bringing to bear his own analysis, judgment, or expertise. *See Rafter v. Raymark Industries, Inc.,* 429 Pa.Super. 360, 366–68, 632 A.2d 897, 900 (1993). Tallman, a senior project manager for Delran Builders, put together cost figures based upon the estimates of subcontractors. It was Tallman's job to compile, synthesize, and evaluate these figures. He did not simply pass these figures on to the court. Appellants claim that the figures for the repair of the roof, stucco and repainting were not Tallman's, but the subcontractors'. R.R. at 560a. Tallman, however, visited the work site three times, and on one of those occasions was accompanied by the stucco contractor and the roofing contractor. Moreover, while the itemized costs may have been generated by the specific subcontractors who were going to do the actual work, these costs were based in part on information provided to the subcontractors by Tallman. R.R. at 545a, 549a–550a. It was Tallman who would readjust the figures by accounting for deleted items and then re-factoring in overhead. R.R. at 547a–548a. We believe that Tallman brought his own expertise to bear in testifying to the cost of replacing the roof, and was not simply rubber-stamping the opinions of out-of-court declarants. That experts rely on the information provided by others is not a novel theory in the law. Charles T. McCormick, EVIDENCE § 14 (3rd ed. 1984); *Pittsburgh Outdoor Advertising Corp. Appeal,* 440 Pa. 321, 326–28, 272 A.2d 163, 166 (1970) (holding that a valuation expert could base his testimony on a written appraisal that was neither offered into evidence nor supported by the in-court testimony of a member of the engineering firm providing the report). We thus cannot say that as a matter of

law there was a clear abuse of discretion in admitting Tall-man's testimony.

Appellants' final contention is that the trial court erred in failing to grant its request for remittitur. We disagree.

If a verdict bears a reasonable resemblance to the proven damages, this Court will not substitute its assessment for that of the trier of fact. *Reimer v. Tien*, 356 Pa.Super. 192, 514 A.2d 566 (1986). Our standard of review is extremely narrow. *Taylor v. Celotex*, 393 Pa.Super. 566, 593, 574 A.2d 1084, 1098 (1990). An order for remittitur is only justified if the verdict is unsupported by the evidence or was the product of "partiality, prejudice, mistake or corruption." *Raymark, supra*, 429 Pa.Super. at 371, 632 A.2d at 902.

There was sufficient evidence that appellees suffered considerable damage to their home due to appellants' inferior workmanship. Appellants claim that appellees' expert witnesses' testimony was the product of factual error and conjecture. We have already addressed this argument. *See* p. 155, *supra*. The trial court opined:

> [I] heard conflicting evidence regarding numerous items that were allegedly defective. True, the most expensive item was the roof—an enormous structure composed of concrete tiles. Yet the plaintiffs also presented evidence respecting at least 30 other items that were allegedly defective. Typically, the defendants offered contrary evidence.... Occasionally, however, they conceded the existence of a defect, and offered evidence instead that the plaintiffs had paid (or were being charged) too much for repairs. In such instance, it was necessary to determine the fair and reasonable cost of correcting the defect, typically on the basis of conflicting expert testimony.

Opinion at 2.

As we have previously stated, it was for the trial court to resolve conflicts in evidence. Given that there was sufficient evidence establishing appellants' breach, we will not allow a remittitur of an award based upon the uncertainty of the

amount of damage. "It is well established that mere uncertainty as to the amount of damages will not bar recovery where it is clear that damages were the certain result of defendant's conduct." *See Spang, supra,* 519 Pa. at 26, 545 A.2d at 866 (quoting *Pugh v. Holmes,* 486 Pa. 272, 297, 405 A.2d 897 (1979)).

In summary, we hold that the exclusive remedy clause does not preclude an award of money damages after appellants' breach of the contract; appellants have failed to show bias or prejudice on the part of the court regarding a major issue sufficient to warrant recusal; the damage award was supported by the record; expert testimony regarding the cost of repair to the roof was properly allowed in by the court; the verdict was not excessive and against the weight of the evidence.

Accordingly, the order is affirmed.