

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-30-2006

# Armstrong v. Burdette Tomlin

Precedential or Non-Precedential: Precedential

Docket No. 03-3553

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Armstrong v. Burdette Tomlin" (2006). *2006 Decisions.* Paper 1658.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1658

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-3553

———————

ARNIE ARMSTRONG,

Appellant

v.

BURDETTE TOMLIN MEMORIAL HOSPITAL;
RICHARD KRAUS, Individually and in his
capacity as employee of Defendant Burdette
Tomlin Memorial Hospital; EDWARD L. MOYLETT,
Individually and in his capacity as employee of
Defendant Burdette Tomlin Memorial Hospital

———————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 00-cv-03441)
District Judge: Honorable Stanley S. Brotman

———————

Argued September 15, 2004

Before: ALITO, AMBRO and FISHER, Circuit Judges

(Filed January 30, 2006)

William B. Hildebrand, Esquire (Argued)
Feldman & Hildebrand
1040 North Kings Highway
Suite 601
Cherry Hill, NJ 08034

      Attorney for Appellant

Timothy M, Crammer, Esquire (Argued)
Crammer & Bishop
508 New Jersey Avenue
Suit B-3
Absecon, NJ 08201

      Attorney for Appellees

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

Arnie Armstrong appeals from an order of the United States District Court for the District of New Jersey denying his motion for a new trial on his claims of failure to accommodate his disability, as well as age discrimination and disability discrimination. Armstrong contends that the District Court erred

2

in charging the jury regarding the elements of his claims and the parties' respective burdens of proof, and in approving jury interrogatories. He also challenges the Court's refusal to grant a retrial on his claims brought under the Fair Labor Standards Act. Although we are not persuaded by all of Armstrong's arguments, we reverse the District Court insofar as it denied his motion for a new trial on his failure to accommodate and disability discrimination claims, and remand for a new trial.

## I. Factual Backgroud

Armstrong began working at Burdette-Tomlin Memorial Hospital (the "Hospital")[1] in 1980, following several years of unemployment due to an earlier neck and back injury.[2] Within a year, Armstrong became a full-time shipping and receiving clerk.[3] Richard Kraus became Armstrong's immediate

---

[1] There are three appellees in this case: the Hospital, Armstrong's employer; Richard Kraus, Armstrong's supervisor; and Edward Moylett, the Hospital's Human Resources Director. Unless specifically named, the appellees hereafter will collectively be referred to simply as the "Defendants."

[2] Armstrong's injury stemmed from an on-the-job fall at a previous employer.

[3] His most recent job title was "distribution stock clerk." This position appears to be nearly identical or the same as "shipping and receiving clerk."

supervisor beginning in 1983 or 1984, and remained his supervisor for the duration of Armstrong's employment at the Hospital.

Armstrong alleges that he took the clerk position because it did not involve heavy lifting that would exacerbate his back and neck problems. The position required placing supplies on carts, pushing the carts and putting the supplies away. According to the Defendants, the position required clerks to be able to lift items weighing up to 150 pounds.[4] Armstrong received satisfactory or better evaluations and regular raises throughout his tenure at the Hospital. In 1998, his last full year there, he received a perfect attendance award.

## A.     Missed Work

Because of recurring back and neck pain, Armstrong missed work for several extended periods during his employment. He was out on disability for more than a month in 1993 (and his grievance challenging increased workloads failed). He had allegedly told his union representative that he could not physically perform the work. When he returned to work a month later, a doctor's note read that he could perform only "light duty" functions. Because the stock clerk's position was not a "light duty" job, the Hospital said Armstrong would

---

[4] It is unclear whether this lifting is actually required to perform the job, or is just part of the official job description.

either have to bid on other jobs or return to his stock clerk position with all the duties required of the position. Armstrong chose to return to his stock clerk position and its full duties.

Armstrong missed work again for several weeks after he re-injured his back and neck during an unsuccessful attempt to jump from a shelf onto a shaky stool in July 1996. Although Armstrong claims the injury resulted from this fall, the Defendants say that Armstrong continued to work without complaint until October 17, 1996, three months after the fall, and that Armstrong's sworn application for disability benefits revealed that he injured himself while working on his farm. Just as he did following the 1993 injury, Armstrong again returned to work with a doctor's note stating that he could not perform heavy lifting, pulling, or bending. But, when told by the Hospital that a distribution stock clerk was not a "light duty" position, and that he could therefore not return to his distribution stock clerk job, Armstrong produced a new note saying that he could work without restriction.

### B. Alleged Harassment

Armstrong alleges that he was harassed by Kraus and other Hospital workers following his return to work. Kraus, Armstrong contends, told him that he worked too slowly and should consider retirement or find another, less demanding, job. He allegedly told Armstrong, "[Y]ou're getting old, we need to have some young blood in the [H]ospital," and he could not

5

have a "cripple" working in his department. Armstrong further claims that Kraus singled him out by increasing his workload and assigning another employee to check and document his work. Kraus denies these allegations and notes that Armstrong never complained to Kraus's supervisor of any harassment.[5]

In addition to the claimed harassment by his immediate supervisor, Armstrong asserts that Ed Moylett (to repeat, the Hospital's Human Resources Director) told Armstrong that he (Moylett) would continually retaliate against Armstrong until he could be fired. This threat allegedly occurred after Armstrong refused to take early retirement. Moylett denies making these comments.

## C.    Linen Distribution

Beginning in 1997, the Hospital created a full-time position for a linen distribution clerk after it ended a contract with a private vendor. A linen distribution clerk injured his back in November 1998, creating an opening in his department. According to Armstrong, the linen job is considerably more strenuous than his stock clerk job because it requires employees repeatedly to bend down and pick up 20 to 30 pound bundles of

---

[5] The Defendants also claim that Armstrong had previously testified that the disparate treatment stemmed from his refusal to "testify" about another employee's poor work, and not his age or disability.

linen from a five-foot-deep cart. The Defendants dispute Armstrong's claim that the linen job is more strenuous, noting that the lifting required for that job—up to 50 pounds—is considerably less than the 150 pounds required of distribution clerks, and that the linen cart has a low-cut front, 30 inches from the floor, so that short workers can easily reach the bundles.

Kraus posted the linen job opening for several weeks, but no one applied. Believing that he might be assigned to this job, Armstrong sent several letters to Kraus in December 1998, reminding Kraus about his chronic back problems and urging his supervisor not to assign him to linen work. The Hospital decided, however, that distribution stock clerks would share the linen clerk's functions when no linen clerk was on-duty, and Armstrong's union agreed, even after Armstrong filed a grievance to prevent transfer of these duties. Armstrong was told by Kraus that he would be required to perform the linen job for at least six months.[6]

---

[6] There is a technical factual dispute concerning the use of the word "job." Armstrong's brief refers to his distribution clerk position as his "old job" and the linen job as a separate position. On the other hand, the Defendants do not consider the linen work to be a different "job" from the distribution work, but rather a function added to the distribution clerk's job responsibilities. How "job" is understood is important for a jury's consideration of what reasonable accommodations were or were not available, since getting Armstrong's "old job" back

### D. Requested Accommodation

Armstrong attempted to do the linen job, but after two weeks he required emergency room treatment. Armstrong brought a doctor's note back to work, stating that he could not perform excessive lifting, bending, pushing, or pulling because it was "aggravating an old condition." Armstrong claimed that the main problem was that the linen cart had tall sides, and reaching over the sides to lift the linen bundles re-aggravated his condition. Although witnesses for the Defendants testified that there is a low-cut front making it easier to remove linens, Armstrong disputes this contention.

According to Moylett, he advised Armstrong that he must be capable of delivering linen in order to perform the essential functions of the distribution stock clerk position. If he could not, Armstrong could apply for other Hospital jobs. Moylett contends that Armstrong never applied for other positions, and that Armstrong also declined an option to switch to the night

would suggest a job transfer as an accommodation to Armstrong's disability, while if "job" is construed to mean focusing on a position's functions, it would suggest substituting, replacing, or eliminating one of many position responsibilities as an accommodation.

shift.[7]   Moylett further claims that he had Armstrong demonstrate the duties he performed to determine the particular problems he had delivering linen, and concluded that the only problem appeared to be that Armstrong did not want to do this work.[8]

Armstrong says that he asked for his "old job" back because he could perform all of those duties without injury, but his request was refused.   When Armstrong produced an additional doctor's note stating that he could not do excessive bending, lifting, pulling, or pushing, Moylett determined that Armstrong could not perform any essential function of a distribution stock clerk, even though Armstrong claimed the only task he could not perform was linen distribution, as the distribution stock clerk position required heavier lifting and more strenuous activity than the functions performed by a linen clerk.

---

[7] Presumably the linen functions do not need to be performed during the night shift, but the Defendants did not say this.   Armstrong also did not mention this offer, and did not acknowledge any open positions available for transfer.

[8] At the heart of the dispute in this case is whether Armstrong is genuinely unable to perform his work.   The Defendants appear to believe that Armstrong used the claim of a handicap to avoid doing the jobs he did not wish to do.

On February 2, 1999, Moylett sent Armstrong a letter acknowledging that he had received the doctor's note, and that because Armstrong could not "perform the basic job functions of your Distribution Clerk position," Armstrong could: "1. Transfer to a mutually agreed upon position in the hospital that you will be able to satisfactorily perform, taking into account your physical limitations. This option was offered to you in May 1998 then again in January 1999. 2. Apply for temporary disability insurance or 3. Resign from the [H]ospital." Armstrong was given until February 8, 1999 to make a decision, after which he would be removed from the payroll based upon his "inability to perform the job functions of your position."

According to Armstrong, because no other jobs were available and since he could not have his "old job" back, he had no choice but to go out on disability. Moylett says that he met with Armstrong several times during the year that he was out on disability to discuss possible job options with him. But when Armstrong did not return to work within a year capable of performing the distribution stock clerk duties (including the linen clerk functions), he was formally terminated.

## II. Procedural History

Armstrong filed suit against the Defendants in July 2000 for uncompensated overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and employment discrimination under the New Jersey Law Against

Discrimination ("LAD"), N.J.S.A. § 10:5-1, et seq. In April 2002, he won a $50,000 verdict for emotional distress and loss of enjoyment of life based upon the LAD hostile work environment claim against the Hospital and Kraus.[9] They filed a motion for a new trial. The Court granted the motion in August 2002 without restrictions or limitations on the scope of the new trial.[10]

At the second trial, Armstrong filed written objections to the proposed charge and jury interrogatories. After they were denied, the jury found in favor of the Defendants on all claims. Armstrong now appeals.[11]

### III. Standard of Review

Generally, we review jury instructions for abuse of discretion. United States v. McLaughlin, 386 F.3d 547, 551-52 (3d Cir. 2004). However, our review is plenary when the issue

---

[9] The FLSA claim was dismissed on an unopposed Federal Rule of Civil Procedure 50 motion at the close of Armstrong's case.

[10] Prior to jury selection in the second trial, the Court reaffirmed its dismissal of the FLSA claim because it had been dismissed prior to jury submission at the first trial.

[11] We have jurisdiction over this appeal under 28 U.S.C. § 1291.

is whether the instructions misstated the law. Id. at 552. We must consider "whether the charge, 'taken as a whole, properly apprise[d] the jury of the issues and the applicable law.'" Smith v. Borough of Wilkinsburg, 147 F.3d 272, 275 (3d Cir. 1998) (quoting Limbach Co. v. Sheet Metal Workers Int'l Ass'n, 949 F.2d 1241, 1259 n.15 (3d Cir. 1991)). Harmless errors in parts of a jury charge that do not prejudice the complaining party are not sufficient grounds on which to vacate a judgment and order a new trial. Watson v. S.E. Penn. Transp. Auth., 207 F.3d 207, 221-22 (3d Cir. 2000).

We review a Court's formulation of jury interrogatories for abuse of discretion. Armstrong v. Dwyer, 155 F.3d 211, 214 (3d Cir. 1998). "The only limitation [on this discretion] is that the questions asked of the jury be adequate to determine the factual issues essential to the judgment." Id. at 216 (citations omitted). We also review for abuse of discretion a Court's determination of issues and claims to be re-tried following the grant of a new trial. Vizzini v. Ford Motor Co., 569 F.2d 754, 760 (3d Cir. 1977).

## IV. Discussion

In order to prevail on his failure to accommodate claim under the LAD, Armstrong had to establish four elements: (1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been

12

reasonably accommodated. See Taylor v Phoenixville Sch. Dist., 184 F.3d 296, 317-320 (3d Cir. 1999); Tynan v. Vicinage 13, 798 A.2d 648, 657, 659 (N.J. Super. 2002).[12]

Armstrong established the first element, as the jury explicitly decided in response to an interrogatory that he was disabled, and the Defendants acknowledge that Armstrong informed the Hospital of his condition. Armstrong also satisfied the second element, as it is undisputed that he expressed the need for accommodation. However, the jury never got to decide whether Armstrong satisfied the third and forth elements because it first found that he had not satisfied an additional element: that he requested a particular accommodation. Unfortunately, although the District Court required Armstrong to show this extra element, he was not required by law to do so. As Armstrong's failure to accommodate claim was denied because he was erroneously forced to demonstrate an element that New Jersey law does not require, and because (as will be shown) but for this error a reasonable jury could have found in favor of Armstrong, we reverse and remand for a new trial on Armstrong's failure to accommodate claim.

---

[12] The requirements for failure to accommodate claims under New Jersey's LAD have been interpreted in accordance with the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. Tynan, 798 A.2d 648, 657 (citing Taylor, 184 F.3d at 319-20).

13

## A.    Specific    Reasonable    Accommodation Requirement

In <u>Taylor</u>, we held that if an employer has adequate notice of an employee's disability, and the employee requests accommodations for the disability, it becomes the responsibility of the employer to "engage the employee in the interactive process of finding accommodations." 184 F.3d at 319. If an "employee could have been reasonably accommodated but for the employer's lack of good faith," the employee will win on his failure to accommodate claim. <u>Id.</u> at 319-20.

Taylor alleged that her employer failed to accommodate reasonably her bipolar disorder after successfully performing the duties of a school principal's secretary for twenty years. Upon her return to work, after being hospitalized for her mental condition, Taylor's employer increased the number of her job responsibilities, changed her job description, and began documenting Taylor's errors. <u>Id.</u> at 302-05. Taylor's request for transfer was denied.

The trial court concluded that, if Taylor's disorder qualified as a disability under the ADA, the "only accommodation that she specifically requested, transfer to another position, was not possible, and consequently, she was not an otherwise qualified individual with a disability." <u>Id.</u> at 302. On appeal, we determined that the trial court incorrectly placed the entire burden to request a specific reasonable

14

accommodation on Taylor without placing any duty on the employer to help her find a reasonable accommodation. Id. at 311. We explained that "[o]nce the employer knows of the disability and the employee's desire for an accommodation, it makes sense to place the burden on the employer to request additional information" to determine whether a reasonable accommodation is available. Id. at 315. In that case, Taylor presented evidence that her employer failed to make genuine attempts to accommodate her disability, and had even hindered attempts to find a reasonable accommodation. Id. at 320.

Applying the four-part failure to accommodate claim test, we reversed, as "a reasonable jury could conclude" that Taylor (1) had a disability that the employer knew about, that she had "(2) requested accommodations, (3) that the school district made no effort to help Taylor find accommodations and was responsible for the breakdown in the process, and (4) that there were accommodations that the school district could have provided that would have made Taylor able to perform the essential functions of her job." Id. Because there existed a genuine factual dispute whether reasonable accommodations existed, a jury had to determine if Taylor's employer engaged in a good faith effort to find a reasonable accommodation.

In Tynan, the Superior Court of New Jersey rejected the employer's claim that it had no duty to provide an accommodation because Tynan had never requested the specific accommodation she sought. 798 A.2d at 656. Handicapped by

15

post-traumatic stress disorder and migraine headaches, Tynan had specifically requested that she report to a different supervisor and have her personnel records purged of warnings. The Court determined that it was not important that her requested accommodation may have been unreasonable, but only that she had "requested assistance." Id. at 657.

Following our decision in Taylor, the Superior Court held that Tynan had the burden only to "make clear that . . . assistance . . . for . . . her disability" was desired. Id. at 657. Once the request is made, "it is the employer who must make the reasonable effort to determine the appropriate accommodation." Id. (citing Taylor, 184 F.3d at 311). "By failing to initiate the interactive process, and forcing Tynan to return without any accommodation" once she made her handicap known and announced her desire for assistance, her employer improperly "forced the termination." Id. at 658. The Court pointed out that certain reasonable accommodations were likely available and remanded for a determination of whether the employer acted in bad faith. Id. at 659.

In Armstrong's case, he lost on his failure to accommodate claim because the jury answered "No." to the following interrogatory (C-3): "Do you find that the plaintiff proved by a preponderance of the evidence that he requested and was denied a reasonable accommodation by the defendants?" (Emphases added.) Thus, the District Court required that Armstrong show that he requested a reasonable

16

accommodation. Furthermore, the jury was instructed that "[Armstrong] has the initial burden of proposing a <u>reasonable</u> accommodation and the proposal must be <u>reasonably</u> specific and compatible with the workplace. Accordingly, the plaintiff must prove that some <u>reasonable</u> accommodation was available and that he requested it." (Emphases added.)

In light of these instructions, there is a substantial likelihood that the jury incorrectly thought Armstrong had the burden of identifying and requesting from the Hospital a specific reasonable accommodation when, in fact, he only had to show he requested an accommodation in order to satisfy the second prong of his failure to accommodate claim. As Armstrong's failure to accommodate claim was denied because he was erroneously forced to demonstrate an element that he did not need to prove, we must reverse and remand unless this error was harmless. In other words, the Defendants could still prevail if we conclude that Armstrong could not establish either the third or fourth elements of his case — his employer did not make a good faith effort to assist, or he could have been reasonably accommodated.

As for the third element, Armstrong contends that the Defendants were never genuinely interested in accommodating him, but simply wanted him to leave. He asserts that there were no other job openings available, despite the Defendants' suggestion that he apply for other jobs. Armstrong also points to testimony by Moylett suggesting that the Defendants did not

17

attempt to accommodate him, but instead made a unilateral decision that he either do the linen functions of the distribution clerk's job or he no longer would be employed.  See Moylett's Testimony, quoted at pp. 27-29 of Appellant's Brief ("Q. '[S]o long as . . . Armstrong felt that he could not do the linen aspect of the job he didn't have a place, he didn't have a job as a distribution clerk at [the Hospital]?' A. '[T]hat's correct.' Q. '[Y]ou either do it or you can't do the job, period?' A. 'That's correct.'").  Thus a reasonable jury could find that Armstrong's employer did not make a good faith effort to assist.

Turning to the fourth element (whether Armstrong could have been reasonably accommodated), this may "include job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities."  Taylor, 184 F.3d at 319 (internal quotation marks omitted).  Armstrong contends that he could still perform all of the essential functions of his "old job," the distribution clerk position, but that he could not do the bending required of the linen job.  He complained specifically about the effect of the linen cart on his handicap.  If a jury believed Armstrong, a new cart, better suited to his condition, could potentially accommodate the handicap.  Or, if more than one clerk is on duty during the same shift, perhaps Armstrong could take over some of the second clerk's distribution

18

responsibilities in exchange for relief from his linen functions.[13] Furthermore, the Defendants acknowledged that reasonable accommodations may have existed.[14] Finally, the jury's finding that Armstrong "was qualified to perform the essential functions of the job with or without accommodation" is consistent with the conclusion that Armstrong could have been reasonably accommodated.

In this context, we cannot conclude the erroneous interrogatory and jury instruction were harmless.[15]

---

[13] Moylett testified that there were five to six distribution clerks in February 1999, all of whom were cross-trained to perform linen clerk functions two days a week.

[14] They argue, for example, that a "kitchen job" was available to Armstrong if he wanted it.

[15] In this case, we determine that a reasonable jury could have concluded that the Defendants did not make a good faith effort to engage in the interactive process. As a result, we need not address at this stage of the proceedings Armstrong's participation in the interactive process. We note, however, our statement in Taylor that, once an employer engages in the interactive process, both parties have an obligation to take part in the process in good faith.

> Participation [in the interactive process] is the obligation of both parties, . . . so an employer cannot

## B. Age and Disability Discrimination Claims

The discrimination inquiry under the LAD (applicable to both Armstrong's age and disability discrimination claims) proceeds in three stages, and is borrowed from from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Gerety v. Atlantic City Hilton Casino Resort, 877 A.2d 1233, 1237 (N.J. 2005).

> To prove a prima facie case of discrimination [under the LAD], the plaintiff must demonstrate that he or she (1) belongs to a protected class; (2) . . . held a position for which he or she was objectively qualified; (3) . . . was terminated from that position; and (4) the employer sought to, or did[,] fill the position with a similarly-qualified person. The burden then shifts to the employer to

> > be faulted if after conferring with the employee to find possible accommodations, the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals.

Taylor, 184 F.3d at 317 (emphasis added).

20

> prove a legitimate, non-discriminatory reason for the employment action. Plaintiff can respond by showing the employer's proffered reason was merely pretext for the discrimination.

Id. (citations omitted).

### 1. Issues Common to Both the Age and the Disability Discrimination Claims

#### a. McDonnell Douglas Analysis

We have noted that "[i]nstructions . . . explain[ing] the subtleties of the McDonnell Douglas framework are generally inappropriate when jurors are being asked to determine whether intentional discrimination has occurred." Pivirotto v. Innovative Sys., 191 F.3d 344, 347 n.1 (3d Cir. 1999). Sometimes, elements of the framework may be given as part of the instructions, but "judges should present them in a manner that is free of legalistic jargon." Id.

The New Jersey courts agree, and have held, that the McDonnell Douglas test should not generally be laid out because the "prima facie case and the shifting burdens confuse lawyers and judges, much less juries, who do not have the benefit of extensive study of the law on the subject." Mogull v. Commercial Real Estate, 744 A.2d 1186, 1199 (N.J. 2000). New Jersey's Supreme Court recently approved Model Jury

21

Charges that "remove from the jury's consideration the issues of whether the plaintiff and the defendant have met the first and second stages, respectively, of the McDonnell Douglas test," supporting instead their consideration by motion for judgment at the end of the plaintiff's case. New Jersey Model Jury Charges, "Introductory Note to the Court," http://www.judiciary.state.nj.us/charges/civil/221.htm.

Even though a district court should not generally include language on the burden shifting analysis or require a jury to decide whether a prima facie case has been established, these, by themselves, are insufficient to vacate a judgment. In Watson v. Southeastern Pennsylvania Transportation Authority, we concluded that harmless error in parts of a jury charge that do not prejudice the complaining party are not grounds to order a new trial. 207 F.3d 207, 221-22 (3d Cir. 2000). In Armstrong's case, the District Court did use legal jargon to describe the McDonnell Douglas burden-shifting analysis, required the jury to consider whether Armstrong established a "prima facie" case of age or disability discrimination, and instructed that the jury had to determine whether the Hospital's suggested reason for its actions was not a "pretext."[16] Nonetheless, we believe each instruction contained an explanation that a reasonable juror could likely understand. As

---

[16] The District Court's relevant instructions on the McDonnell Douglas burden-shifting framework are reprinted in the Appendix that is attached to this opinion.

22

a result, though the District Court should not have instructed the jury on the entire <u>McDonnell Douglas</u> burden-shifting analysis and should have avoided sporadic use of "legalese," these were harmless errors.

### b. Absence of Rebuttable Presumption Instruction

Armstrong claims that the District Court erred by failing to instruct the jury that establishing his <u>prima facie</u> case gives rise to an inference or rebuttable presumption of discrimination. An instruction should have appeared, he asserts, that stated that the establishment of a <u>prima facie</u> case <u>may</u> give rise to an inference of discrimination <u>if</u> the jury disbelieves the employer's explanation for its discharge decision. <u>Smith v. Wilkinsburg</u>, 147 F.3d 272, 280 (3d Cir. 1998). However, the exclusion of the instruction was harmless because the jurors never reached the point where they would have been permitted to infer discrimination for either of Armstrong's discrimination claims because: (1) as to Armstrong's age discrimination claim, the jury believed the Defendants' explanation for the discharge decision; and (2) as to Armstrong's disability discrimination claim, the jury found that Armstrong did not establish his <u>prima facie</u> case.

### c. The Interrogatories

Armstrong argues that the use of language in the

23

interrogatories such as "pretext," and requiring the jurors to answer interrogatories related to establishing a "<u>prima facie</u>" case of discrimination and whether a legitimate reason for discharge was proven, confused them. Although the word "pretext" was used in two interrogatories,[17] the corresponding instructions, as noted, contained an explanation that a reasonable juror could likely understand. Further, Armstrong's claim is incorrect that the jury should not have been asked to decide whether the Defendants' legitimate business reason was pretext. There existed genuine factual disputes in this regard, and the Judge appropriately presented this question for the jury.

Armstrong also argues that the focus on his "discharge" in the interrogatories, as the adverse employment action at issue, was improper because his claims focused not on the "discharge" occurring a year after he had gone out on disability, but on the events that he alleges "forced" him to leave the Hospital's employ. However, Armstrong offers no evidence to suggest that the jury was confused about the use of the term "discharge." The entire case revolved around the events leading up to Armstrong's leaving work, and there is no reason

_____

[17] Interrogatory A-4 asked whether the jury found, by a preponderance of the evidence, that "the plaintiff proved that defendant's legitimate business reason [for dismissing Armstrong] was a pretext for [age] discrimination?" Interrogatory B-6 asked the same question with respect to disability discrimination.

24

to believe that the jury considered the subsequent "discharge" to be a separate event.

### 2. Issue Specific to Armstrong's Age Discrimination Claim — Incorrect Instruction on Reason for Discharge

Armstrong contends that the District Court's instruction on his age discrimination claim incorrectly stated the legitimate, nondiscriminatory reason for firing him that the Defendants gave at trial. The District Court instructed the jury that the reason the Defendants gave for discharge was that Armstrong was "unable to perform the essential functions of his job." Armstrong asserts that the reason the Defendants actually gave for discharging him was that he was able but <u>unwilling</u> to perform the essential functions of his job.

The Defendants acknowledge this, but claim that the Judge's description of the reason was hardly incorrect, as "[t]here was no confusion on anyone's part during the trial what the [D]efendants' position was: If . . . [Armstrong] could, as he always maintained, lift all of the items that a stock clerk must lift except bundles of linen, then he was 'unable' to perform the functions of the job because he refused to perform them and not because he had any handicap or disability that prevented him from doing so."

We need not determine which reason the jury thought the Defendants gave, however, because the jury found in its answers to interrogatories that (1) they articulated a legitimate business reason for discharging Armstrong, and (2) the reason they gave was <u>not</u> a pretext for age discrimination. Thus, the jury found that Armstrong was discharged either because he was unwilling or unable to do his job and that he was <u>not</u> discharged because of age discrimination.

As the jury found the Defendants' legitimate business reason was not a pretext for age discrimination, we may not reverse the verdict against Armstrong on this claim on the basis of the District Court's erroneous description of the Defendants' proffered reason for discharge. Further, as we are not persuaded by Armstrong's other (previously addressed) arguments related to his age discrimination claim, we affirm the jury's verdict against him on this claim.

> **3.  Issues Specific to Armstrong's Disability Discrimination Claim**
>
> **a.  Requirement that Armstrong Show He was Discharged Because of His Handicap**

The District Court instructed the jury that, to establish a <u>prima facie</u> case on his disability discrimination claim, Armstrong had to show that "he was discharged <u>because of</u>

[his] handicap." (Emphasis added.) Armstrong only needed to show he was discharged, however, and did <u>not</u> need to show it was because of his handicap, to establish his <u>prima facie</u> case. Nonetheless, because Armstrong did not raise this issue to the District Court in his objections to the instructions and interrogatories, and also did not raise the issue on appeal, it is waived.

### b. Incorrect Instruction on Reason for Discharge

As previously discussed in the age discrimination context (see Part IV.B.2 above), Armstrong argues that the District Court's instruction on his disability discrimination claim incorrectly stated the asserted legitimate, nondiscriminatory reason for firing Armstrong that the Defendants gave at trial. We know from the jury's answers to the disability discrimination interrogatories and age discrimination interrogatories (which show, <u>inter alia</u>, that the jury found that Armstrong was discharged and that the Defendants sought someone to perform the same work after he left) that: (1) Armstrong established a <u>prima facie</u> case for disability discrimination; (2) the Defendants articulated a legitimate reason for discharging Armstrong; and (3) that reason was not a pretext for discrimination. Thus, assuming the jury understood the Judge's instructions to mean what they plainly

27

and literally mean,[18] the jury found that the Defendants discharged Armstrong because he was unable to do the essential functions of the job and not because of discrimination.  The problem is that was not enough for the Defendants to prevail.

The jury instructions stated that the legitimate business reason the Defendants gave for discharging Armstrong was the belief that Armstrong could not physically perform the essential functions of the job assigned to him because of his handicap.  In this context, the burden should have shifted to the Defendants.  See Jansen v. Food Circus Supermarkets, Inc., 541 A.2d 682 (N.J. 1988) (explaining that when "the employer defends [after the establishment of a prima facie case] by asserting . . . that the handicap prevented the employee from working, the burden of proof . . . shifts to the employer to prove that it reasonably concluded that the employee's handicap

_____

[18] The Defendants assert that the District Court's description of the reason was not incorrect, and (as noted above) that "[t]here was no confusion on anyone's part during the trial what the [D]efendants' position was: If . . . [Armstrong] could, as he always maintained, lift all of the items that a stock clerk must lift except bundles of linen, then he was 'unable' to perform the functions of the job because he refused to perform them and not because he had any handicap or disability that prevented him from doing so."  We are unwilling to assume, however, that when the Court said "unable" the jury knew he really meant something close to the opposite, i.e., "able but unwilling."

28

precluded performance of the job"); see also Ensslin v. Twp. of N. Bergen, 646 A.2d 452, 457 (N.J. Super. App. Div. 1994) ("Where, as here, an employer maintains that it has reasonably concluded that the employee's handicap precluded performance of the job, and has terminated the employee for that reason, the burden of proof is on the employer."). Because the District Court did not require the Defendants to satisfy this burden — and therefore the jury was not properly instructed that the Defendants' belief that Armstrong could not do the job because of his physical limitations had to be reasonable and that the burden of proving this was on the Defendants — we reverse and remand for a new trial of Armstrong's disability discrimination claim.[19]

## C.    Denial of Retrial of Armstrong's FLSA Claim

We review for abuse of discretion determinations of issues and claims to be retried following the grant of a new trial. Vizzini, 569 F.2d at 760. Under Federal Rule of Civil Procedure 59(a), a partial new trial is appropriate if the issue being "retried is so distinct and separable from the others that a trial of it alone may be had without injustice." Gasoline

---

[19] We note that, on remand, the burden should only shift to the Defendants if they assert that they discharged Armstrong because his handicap prevented him from working, but not if they assert that they discharged him for a legitimate nondiscriminatory reason.

29

Products Co. v. Caplin Refining Co., 283 U.S. 494, 500 (1931); see also Stanton by Brooks v. Astra Pharm. Prods., 718 F.2d 553, 576 (3d Cir. 1983).

Here, the FLSA was dismissed on an unopposed Federal Rule of Civil Procedure 50 motion before the first case went to the jury and after Armstrong had agreed that there was no evidence to support the claim. As such, it is difficult to understand how the FLSA claim could be so closely intertwined with the LAD claims to require its retrial if both parties agreed that no support existed for the FLSA claim, and yet sufficient evidence existed to send the separate LAD claims to the jury. Thus, the District Court did not abuse its discretion by ordering a new trial on the LAD claims that were decided by the jury while denying retrial on an issue previously dismissed for lack of evidence.

## V. Conclusion

In this context we: (1) reverse and remand for a new trial Armstrong's failure to accommodate claim; (2) affirm the verdict against Armstrong on his age discrimination claim; (3) reverse and remand for a new trial Armstrong's disability discrimination claim; and (4) affirm the District Court's decision to deny retrial of Armstrong's FLSA claim.

30

# APPENDIX

## District Court's Jury Instructions Regarding the
## <u>McDonnell Douglas</u> Framework

### [I.] <u>INTENTIONAL AGE DISCRIMINATION CLAIM</u>

The plaintiff contends that the defendants took adverse action against him because of his age in violation of the LAD. Specifically, the plaintiff contends that the defendants with discriminatory intent treated him differently from other employees, transferred him to a position he could not perform, and further forced him to take a leave of absence and, ultimately, discharged him from his position as a distribution stock clerk either because of or on account of his age. In order to prevail on a disparate treatment age discrimination claim, the plaintiff must show that the defendants acted with discriminatory intent.

Briefly summarized, your analysis will proceed in three stages. First, you must evaluate whether the plaintiff establishes a prima facie, or initial, case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendants "to articulate some legitimate, nondiscriminatory reason for the adverse employment action." Finally, should the defendants carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the

legitimate reasons offered by the defendants were not the true reasons, but were a pretext for discrimination.

## A. PLAINTIFF'S PRIMA FACIE CASE

The plaintiff's prima face case is established if he shows, by the preponderance of the evidence, that:

(1)    he is member of a class protected by the anti-discrimination law;

(2)    he was performing his job at a level that met his employer's legitimate expectations;

(3)    he was discharged; and

(4)    the employer sought someone to perform the same work after he left.

I charge you that the plaintiff was 58 years old at the time of the alleged adverse employment action and, as such, he was a member of a protected class. Therefore, the first element of the plaintiff's prima facie case is satisfied. If you find that the plaintiff has not proven the last three elements by a preponderance of the evidence, however, you must decide in favor of the defendants on the plaintiff's claim for intentional age discrimination in violation of the LAD.

## B.  DEFENDANTS' REBUTTAL

If you find that the plaintiff has proven his initial case, the defendants must articulate a legitimate, nondiscriminatory reason for its [sic] decision.  The defendants are not required to prove the validity of its [sic] reason by a preponderance of the evidence, but need only articulate facts or produce evidence sufficient to raise a genuine question as to whether the plaintiff was discriminated against because of his age.   Here, the defendants maintain that they discharged him because he was unable to perform the essential functions of his job.  Nevertheless, the plaintiff may still prevail on his claim if he has proven that the reason the defendants present is merely a pretext for age discrimination.

## C.  PRETEXT

To prove pretext, the plaintiff must show by a preponderance of the evidence that the defendants' reason is not worthy of belief or that, more likely than not, it is not the true reason or not the only true reason for its action.

If you find that the plaintiff has not satisfied his burden of proving that the defendants' reason is pretext, then you must return a verdict in favor of the defendants.  If the plaintiff demonstrates that more likely than not, age discrimination was at least one reason for his discharge, then you must also decide

33

whether the consideration of age was a determinative factor in the decision.

## D. DETERMINATIVE FACTOR

To succeed on his intentional age discrimination claim, the plaintiff must prove not only that his age was a factor in the defendant's decision, but that his age was a determinative factor in the challenged treatment. The plaintiff need not prove that his age was the defendant's sole or exclusive consideration, but that his age made a difference in the decision to discharge him. If you find that the plaintiff's age was not a determinative factor in the defendants' employment decision, you must find in favor of the defendants. If you find that the plaintiff's age was a determinative factor in the defendant's employment decision, you must find in favor of the plaintiff.

Remember that the plaintiff bears the ultimate burden of proving that more likely than not, the defendants practiced intentional age discrimination against him. Even if you determine that the defendants' stated reason was pretext or a cover-up, you may or may not conclude that the plaintiff was, more likely than not, a victim of intentional age discrimination. Furthermore, you should note that you are to consider the totality of the circumstances and all the relevant, credible evidence presented during the trial in making your determination as to whether the defendants more likely than not discriminated against the plaintiff because of his age in violation of the LAD.

# [II.]  INTENTIONAL DISABILITY DISCRIMINATION CLAIM

The plaintiff contends that the defendants took adverse action against him because of his disability in violation of the LAD.  Specifically, the plaintiff contends that the defendants with discriminatory intent treated him differently from other employees, transferred him to a position he could not perform, and further forced him to take a leave of absence and, ultimately, discharged him from his position as a distribution stock clerk either because of or on account of his disability.  In order to prevail on a disparate treatment disability discrimination claim, the plaintiff must show that the defendants acted with discriminatory intent.

Briefly summarized, your analysis will proceed in three stages.  First, you must evaluate whether the plaintiff establishes a prima facie, or initial, case of discrimination.  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendants "to articulate some legitimate, nondiscriminatory reason for the adverse employment action."  Finally, should the defendants carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendants were not the true reasons, but were a pretext for discrimination.

35

## A. PLAINTIFF'S PRIMA FACIE CASE

The plaintiff's prima facie case is established if he shows, by the preponderance of the evidence, that:

> (1)    he was handicapped within the meaning of the statute;

> (2)    he was performing his job at a level that met his employer's legitimate expectations;

> (3)    he was discharged because of the handicap; and

> (4)    the defendants sought someone to perform the same work after he left.

To establish the first of these elements, plaintiff must prove that he suffered from a handicap. "Handicapped" means suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness of speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or from any mental, psychological or developmental disability resulting from anatomical, psychological,  physiological or neurological conditions which

prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. In addition, "handicapped" also includes someone who is perceived to be handicapped or has a record of such impairment. It makes no difference whether the disability is work related or not.

It is the plaintiff's initial burden to prove these four elements by a preponderance of the evidence. If you find that the plaintiff has not proven these elements by a preponderance of the evidence, you must decide in favor of the defendants on the plaintiff's claim for intentional disability discrimination in violation of the LAD.

## B.  DEFENDANTS' REBUTTAL

If you find that the plaintiff has proven his initial case, the defendants must articulate a legitimate, nondiscriminatory reason for its [sic] decision. The defendants are not required to prove the validity of its [sic] reason by a preponderance of the evidence, but need only articulate facts or produce evidence sufficient to raise a genuine question as to whether the plaintiff was discriminated against because of his disability. Here, the defendants maintain that they discharged him because he was unable to perform the essential functions of his job. Nevertheless, the plaintiff may still prevail on his claim if he has proven that the reason the defendants present is merely a pretext for disability discrimination.

## C.  PRETEXT

To prove pretext, the plaintiff must show by a preponderance of the evidence that the defendants' reason is not worthy of belief or that, more likely than not, it is not the true reason or not the only true reason for its action.

If you find that the plaintiff has not satisfied his burden of proving that the defendants' reason is pretext, then you must return a verdict in favor of the defendants.  If the plaintiff demonstrates that more likely than not, disability discrimination was at least one reason for his discharge, then you must also decide whether the consideration of disability was a determinative factor in that decision.

## D.  DETERMINATIVE FACTOR

To succeed on his intentional disability discrimination claim, the plaintiff must prove not only that his disability was a factor in the defendant's decision, but that his disability was a determinative factor in the challenged treatment.  The plaintiff need not prove that his disability was the defendant's sole or exclusive consideration, but that his disability made a difference in the decision to discharge him.  If you find that the plaintiff's disability was not a determinative factor in the defendants' employment decision, you must find in favor of the defendants. If you find that the plaintiff's disability was a determinative

38

factor in the defendants' employment decision, you must find in favor of the plaintiff.

Remember that the plaintiff bears the ultimate burden of proving that more likely than not, the defendants practiced intentional disability discrimination against him. Even if you determine that the defendants' stated reason was pretext or a cover-up, you may or may not conclude that the plaintiff was, more likely than not, a victim of intentional disability discrimination. Furthermore, you should note that you are to consider the totality of the circumstances and all the relevant, credible evidence presented during the trial in making your determination as to whether the defendants more likely than not discriminated against the plaintiff because of his disability in violation of the LAD.